MYERS et al. v. LLOYD et al.

(Fourth Division. Fairbanks. December 7, 1910.)

No. 1154.

1. MINES AND MINERALS (§ 16*)—LODE.

A vein, lode, or ledge, terms used in this opinion synonymously, means a body of mineral or mineral-bearing rock within defined boundaries in the general mass of a mountain. To constitute such vein, lode, or ledge, it is not necessary that it be hard or quartz rock, but any combination of rock, though broken and mixed up with mineral and other things, is sufficient if in place. It must, however, be mineral-bearing rock, though not necessarily ore or mineral.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 21–23; Dec. Dig. § 16.*]

2. MINES AND MINERALS (§ 17*)—DISCOVERY.

The value of the rock in a vein is not a determining element in the question of discovery. The finding of mineral-bearing rock in place constitutes a valid discovery, whether such rock assays high or low. It is the finding of the mineral rock in place, as distinguished from the float rock, that constitutes discovery and warrants the prospector in making a location of a mining claim.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 24–28; Dec. Dig. § 17.*]

3. MINES AND MINERALS (§ 38*)—LODE CLAIM—TUNNEL SITE—INJUNCTION.

Plaintiffs located a quartz, ledge, or lode mining claim by discovering mineral-bearing rock in place on the claim, and marking the boundaries so that they could be readily traced and completed the work on October 4th. Thereafter, and on October 7th, the defendants located a tunnel site so that the extension of the tunnel would run through plaintiffs' lode claim. The defendants worked on their tunnel to a point near the plaintiffs'

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

line, and, threatening to enter, plaintiffs applied for, and the court granted, an injunction to restrain defendants from trespassing upon the ground, because the valid location of the prior lode claim cut off defendants' subsequent tunnel right at the line.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 87½–113; Dec. Dig. § 38.*]

This is an action to quiet title to a quartz location known as the Rex lode mining claim, situate on the left limit of Chatham creek, tributary to Cleary creek, in the Fairbanks recording precinct, Fourth judicial division, Alaska. The facts are stated in the opinion.

John L. McGinn, A. R. Heilig, and Leroy Tozier, all of Fairbanks, for plaintiffs.

James Wickersham and John A. Clark, both of Fairbanks, and Jos. H. Bullock, for defendants.

OVERFIELD, District Judge. Under the pleadings and evidence in this case, there is raised the validity of the Rex lode location; the plaintiff claiming to have made a valid location on the 4th day of October, 1908, and prior to the intervention of any rights of the defendants, included within the boundaries of the Rex lode mining claim. The defendants allege their right to the ground along their tunnel location, within the limits allowed by the statute, by reason of the location of the Butler-Petree tunnel, made on October 7, 1908, or three days after the alleged date of location of the Rex lode mining claim. They would justify their tunnel location at the latter date on the ground that the Rex lode mining claim was not a valid location.

The question raised under the facts and evidence in this case is the proper and required acts to be done by the locator, under the statute, in order to make a valid location of a quartz mining claim in Alaska.

The difficulty, if any, in reaching a just decision in this action is not so much what the law demands of the miner and prospector, in making a valid quartz location, as in construing

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

and giving proper weight and consideration to the evidence which has been produced during the trial, especially where conflict exists in the same. I take it that the law is generally known by all hard rock miners and prospectors with reference to making a valid quartz location; the conflicts arise in construing the now well-known decisions on the statute in question. To begin with, the statute providing for the location of quartz or lode claims contains what seems to be short and concise terms. Rev. St. 2320 (U. S. Comp. St. 1901, p. 1424).

First. The discovery must be made of a vein or lode of quartz or other rock in place, bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposits;

Second. No location of a mining claim shall be made until the discovery of a vein or lode within the limits of the claim located, and no claim located by one person shall extend more than 1,500 feet along the vein or lode, nor more than 300 feet on each side of the middle of the vein at the surface; the width of the claim may, however, be limited, by any mining regulation, to a distance of not less than 25 feet on each side of the middle of the vein on the surface. The end lines of each claim shall be parallel to each other.

However, what constitutes a vein, lode, or ledge in place is meant by this statute, and as generally understood by miners and prospectors, and the differences of opinion on this branch of the subject of a valid location evidently was the occasion of this suit. A vein, lode, or ledge, terms used in this opinion synonymously, means a body of mineral or mineral-bearing rock, within defined boundaries in the general mass of a mountain. To constitute such vein, lode, or ledge, it is not necessary that it be hard or quartz rock, but any combination of rock, though broken and mixed up with mineral and other things, is sufficient, if in place. It must, however, be mineral-bearing rock, though not necessarily ore or mineral.

The value of the rock within it is not a determining element in the question of discovery  The finding of mineral-bearing rock in place constitutes a valid discovery, whether such rock assays high or low. A vein, lode, or ledge which may be located is a seam or fissure in the earth's crust, filled with quartz or

some other kind of mineral-bearing rock in place, carrying gold, silver, lead, or other minerals mentioned in the statute. It is not enough to discover detached pieces of quartz or mere bunches of quartz in loose, slide, glacial wash, or débris; it must be found in rock in place.

The vein, however, may be thin or it may be thick, or very thin in some places and very wide in some places; that is, widening from a mere seam to an extensive ore body    Thus, a very thin vein may connect two larger deposits of ore, and, though thin, constitutes the vein, lode, or ledge mentioned under the statute; and so a discovery made on such thin part of a vein, lode, or ledge, if it be in place, constitutes a valid discovery. Likewise such vein, lode, or ledge may carry little values in places, and in other places exceedingly high values.

It is necessary only to discover a vein, lode, or ledge in place, whether small or large, rich or poor, at the point of discovery, to entitle the locator to a valid location of a quartz mining claim on such vein, lode or ledge. It is the finding of the mineral rock in place, as distinguished from the float rock, that constitutes discovery and warrants the prospector in making a location of a mining claim. The general principle which underlies and which should be applied to the question as to whether a valid discovery has been made is that no miner or prospector would naturally desire to make a location or spend time or money in mining for mere pleasure, particularly in the frozen hills of this district, or unless he has discovered such indications on vacant ground, or has knowledge of mineral within the limits of ground already located, sufficiently near the ground sought to be located, to afford a just and reasonable inference that the expenditure of time and money upon the ground so desired to be located will be likely to develop such a showing of mineral as to justify its location as a mining claim. So a discovery may be said to be made under the statute when a prospector or miner has found rock in place, or such indications of the presence of ore in rock in place, as would justify a miner in spending his time and money upon it, with a reasonable expectation of finding ore in paying quantities.

The next part of the subject of a valid location we must con-

sider in connection with a vein, lode, or ledge is the phrase "rock in place." On this term, as applied to the facts and evidence in this case, depends the final decision. "Rock in place," as used in the state, means the body of the country in a particular locality, which has not been affected by the action of the elements, and which may be said to remain in its natural, original state and condition, as distinguished from the superficial mass lying above it; that is, "rock in place" is solid, fixed rock, as distinguished from surface slide, débris, alluvial, or wash. Yet rock in place does not necessarily mean solid rock, in the sense that it should be free from breaks, seams, or gashes. It rather means the solid substance of which the particular mountain or locality is constituted, the substance forming the mountain, as was said in the case of Iron Silver Mining Co. v. Cheesman, 116 U. S. 529, 6 Sup. Ct. 481, 29 L. Ed. 712:

"Excluding the wash, slide, or débris on the face of the mountain, all things in the mass of the mountain are in place."

It was also said in another Colorado decision (Leadville Min. Co. v. Fitzgerald, 15 Fed. Cas. p. 98, No. 8,158):

"That a vein, lode, or ledge cannot be said to be in place unless it be incased by ore held within the general mass of fixed and immovable rock. It is not enough to find a vein, lode, or ledge lying on top of a fixed and immovable rock, for that which is on top is not within, and that which is without the rock in place cannot be said to be within it."

Whether the vein, lode, or ledge is in place depends upon its position in the crust of the earth; that is, whether the vein lode, or ledge is inclosed by a mass of country rock comprising the mountain, more than upon the character of the ore itself. Whether the ore or vein matter is loose or friable, or very hard, if the inclosing walls are country rock, it may be located as a vein or lode. But, if the ore or vein matter be on top of the solid mass of the country rock which constitutes the mountain, then it cannot be in place, though it be covered with slide, alluvial, wash, or débris, no matter to what depth or to what extent.

The next part of the subject which we are concerned with in this decision is the marking of the boundaries of the lode claim

as required under section 2324, Revised Statutes (U. S. Comp. St. 1901, p. 1426), which reads as follows:

"The location must be distinctly marked on the ground so that its boundaries can be readily traced."

What constitutes a sufficient marking upon the ground very naturally and properly depends, under all decisions of the courts, upon the conditions existing at the place of the location. What might be sufficient marking of a location in one place would not be in another, by reason alone of the difference in the character and surface of the ground; some places being level and practically clear of brush, trees, or any kind of obstruction, so that a prospector, standing at a corner or center stake, might very readily see the opposite end or corner stake, while in the mountains or hills of this district there are cuts, ravines, and knolls, covered with spruce or birch timber, in some places so close together in their growth that it would be practically impossible for the prospector or miner to readily trace the boundary of a location, from the fact that corner or center stakes alone were used.

So it has been very properly the custom of miners and prospectors in the hills about Fairbanks to mark the boundaries of their locations by cutting out the timber and brush along their lines, and, when this plan is not followed, trees along the lines are blazed sufficiently to enable the ordinary miner or prospector, using reasonable diligence, to follow such lines when looking for the boundaries of mining claims, in good faith.

It now becomes necessary to apply the evidence produced at the trial to the law, as hereinbefore set forth. The evidence discloses that the Rex lode location was completed on October 4, 1908, the claim running in a diagonal direction across to the north side of the mountain, on the left limit of Chatham creek, about one-half mile from its mouth; that it was a claim located 1,500 feet in length and 300 feet on each side of the center line; that subsequently, on October 7, 1908, the tunnel location in question was initiated, running at about right angles to the side line of the Rex, and crossing the same, the discovery post at the mouth of the tunnel being less than 50 feet from the

north side line of the Rex, but outside of the boundaries and still further down the mountain side, nearer to Chatham creek.

The defendants began work running the tunnel on their location on or about October 14, 1908, and continued in a workmanlike manner until they had gone in some 80 feet, across and under the side line of the Rex claim, at which point they were enjoined by this court from further work, pending the trial of this action.

The evidence on the part of the plaintiffs is that the location of the Rex claim was made between the 1st and 4th of October, 1908. One Spaulding, under the employment of the plaintiffs and their predecessors in interest, with two laborers, Larson and Dahl, doing, as alleged, the acts required to constitute a valid quartz location.

Spaulding testifies: That he visited the nearby locations to the east of the Rex claim and across Chatham creek in August, and was also present further to the west, on the south side of the hill on which the Rex is located, a distance of some hundred feet, when Louis Rhodes made his discovery and location on Bedrock creek. That by reason of the strike of the vein which he saw exposed, particularly on the North Star and Bill Taft locations, being to the east of the Rex, and believing that the strike ran east and west, and that he would find the vein or lode across Chatham creek, on the ground that he subsequently located, and accordingly, on October 1st, began marking the location in question, first putting up his corner and center end stakes, and then beginning on the lower hill side of the claim, but inside the north side line, to sink prospect holes or shafts, assisted by his colaborers.

This work was prosecuted in this manner in order that the vein might be located, as there was no outcropping on the surface of the mountain; the side hill being covered with moss and earth for a distance of a few inches, underneath which is slide rock. After spending some two days sinking these prospect holes, in which float was found, evidencing vein matter, they finally located in one of these prospect holes, considerably up the side of the hill, what they termed the vein. This shaft was sunk through moss and earth a few inches, then in loose

slide rock for about three or four feet, when the solid rock became more firm, and finally, when about five or six feet from the surface, hard rock or bed rock, as they termed it, was encountered, through two feet of which they continued to sink their shaft, which was in dimensions some four feet by six feet, and about seven to eight feet in depth on the uphill side, and three or four feet on the lower side. The open cut was then run from the hillside into and connected with the shaft, the level of the shaft and that of the open cut being about the same; the open cut being from 10 to 15 feet in length and about 2 to 3 feet wide in the bottom.

It is to the open cut and shaft that the testimony in the action is almost entirely directed, for on the showing made therein is based the discovery of the Rex location. The fact that this open cut on the Rex, which had become more or less filled with ice and sloughings, was, by some misunderstanding, not put into condition to be viewed by the court or witnesses at the time of the trial necessitates the finding of the court to be based entirely upon the evidence of witnesses who had the opportunity and did view this work on the Rex claim in 1908. Some of the leading quartz prospectors of the camp were offered this opportunity and appeared at the trial, having examined the Rex property in October and November of 1908, and, not having seen the same since, necessarily base their evidence on what they saw at that time in the open cut and shaft.

Spaulding details the marking of the boundaries of the location of the Rex on the ground, posting a notice of the location, first putting up corner and center end posts, and blazing lines on the standing or growing trees, which more or less cover the mountains between Chatham and Bedrock creeks. But after having discovered the vein in the open cut on October 4th, and by reason of the discovery of the strike of the vein therein disclosed in the open cut, had occasion to move the western end of his location some 150 feet further up the hill, which he did at that time by erecting a new center end stake at the west end of the claim, and a new northwest and southwest corner, each 300 feet distant from the center line of the location as then marked, and at that time he also cut from the

stakes abandoned the former markings, and blazed new lines between the corner posts subsequently erected and adopted at that time. The nature of the work done on the Rex claim, so far as disclosed by the evidence, was the running of a tunnel some 20 feet in length lower and to the left of the open cut, such work having been done by the plaintiffs during the month of September, 1909. The top of this tunnel, some four or five feet below the bottom of the open cut, ran into the hill about the same distance as did the open cut and shaft, although a few feet to the left; that is, the tunnel was not directly underneath the open cut. The testimony of the witnesses who saw the open cut on the Rex claim in 1908 vary, as naturally would the version of a number of prospectors who might have made examination of a discovery shaft some two years ago, and had not since seen it.

Many witnesses who examined the open cut in 1908, in fact probably all, knew that a lawsuit would result. over the question of discovery on the Rex, and were accordingly anxious or otherwise to be informed as to the actual conditions then existing there. Some looked at the open cut and shaft and made but a casual observation for either a vein or lode in place, or as to the character, formation, composition, solidity, strike, dip, and as to its being mineralized rock. There were several, however, of the leading prospectors of this district who made a more careful examination at that time, as they testified, employing such tools or implements as were convenient and necessary for the purpose, and some took away samples of what they termed vein matter, then found in the bottom of the open cut, and had an assay made of the same, which showed considerable values in gold, in one instance at least $50. These prospectors and miners were men interested in surrounding locations, in the vicinity of the Rex claim, and devoting their time to the development of quartz claims in Alaska; men who for the most part have had more than ordinary experience, both in the states and in Alaska, in prospecting and mining in hard rock, as distinguished from placer mining. That they could not be mistaken, and they testified in numbers, to having seen the vein or lode some four to six inches in thickness, and ex-

tending from four to six feet across and along the open cut, I have no doubt.

The testimony on this point is by a fair preponderance, and is contradicted by no one who could or did make an extended or careful examination of the open cut, as shown by the evidence, when conditions were favorable for such examination, other than the witnesses Lloyd and Thomas, who were upon the property early in October; Lloyd having visited the property and made an examination before making his tunnel location.

The testimony of the witnesses for the defendants go only to the fact that, not having employed implements or tools with which to make an examination, when more than likely the bottom of the cut was frozen and covered with snow to a depth of at least a few inches, they neither saw the vein nor rock in place, as detailed by the witnesses for the plaintiffs, who ran the cut and shaft, or made a careful examination. It is at the same time significant that some of the defendants' witnesses, as well as Lloyd, did see some evidence of quartz or vein matter and solid rock, as distinguished from slide; the witness Thomas testifying that he found what he believed to be rock in place in one part of the tunnel on the Rex claim. Lloyd, who visited the open cut and decided that in his opinion there was not sufficient discovery saw some evidences of quartz or vein matter, and thereafter made the tunnel location, under which the defendants claim title in this action.

A fair preponderance of the evidence not only shows that a vein, as above mentioned, was uncovered by the plaintiffs and their predecessors in interest, prior to October 7, 1908, but that the vein was incased or inclosed by rock in place, though probably somewhat broken up; that the walls or crevices in which the vein ran, in an easterly and westerly direction in its strike, were composed of schist.

Little development work has yet been done in the vicinity of Fairbanks to demonstrate of what the mass of the mountains or hills are composed, or whether the surface rock is affected in depth to any great extent by the extreme climatic conditions existing for probably countless ages. But so far as known, and

as shown by the evidence, the hills between Chatham and Bedrock are probably composed of what might be termed "country rock," "schist," or bed rock.

The work done in the open cut and tunnel on the Rex, as well as that on the defendant's property and others adjoining, shows that the immediate surface of the hill underneath the moss and earth is schist, slide rock, broken up in irregular, more or less square pieces, showing no effects of erosion, and usually closely bedded, as though never having been thrown apart or separated to any appreciable distance, unless moved in one large mass in the same general direction. There is evidence that the vein exposed in the open cut in the Rex, as well as the vein in the Butler-Petree tunnel, may have been for some distance at least bent over down the hillside, and for that reason could not be in place, until uncovered and exposed where it begins its regular dip into the foundation or rock in place in the Chatham hill.

Cunningham, a mining engineer of repute, testified that in his opinion the vein was thus bent over, and lying practically in a horizontal position for a distance of about 40 feet, as disclosed and followed in the Butler-Petree tunnel, at which point, some 25 feet in a vertical direction to the surface of the hill, it began its regular dip into the ground, between well-defined walls, glazed and smooth. The testimony of the witnesses who examined the open cut likewise tends to show that the vein therein disclosed was somewhat flat, but in the bottom of the open cut and shaft, for the last two feet, had straightened up, and in their opinion assumed its regular dip into the ground between well-defined, but more or less broken or seamed, walls of schist or country rock, called bed rock. On account of the contour in the hill differing at the Rex cut and at the Butler-Petree tunnel, a much less portion of the vein might have been very naturally displaced by having been bent over, in the course of time, by the elements.

It is therefore not unlikely that, at different points along the same side of the hill, the vein might be found to be bent over from its original position or dip on the surface to a greater or less degree, and in extent. In fact, in places, the vein may be

4 A.R.—18

cut off entirely, by reason of the action of the frost and the attending slides of rock and snow, while in others merely bent over for a more or less distance. The testimony preponderates that the vein in the open cut was not severed, and that at least for the last few feet in the bottom of the shaft it had resumed its natural and original position in its dip, and was inclosed by walls in place. The witnesses by a fair preponderance of the testimony, who carefully made an examination of the open cut on the Rex, testify that in their opinion, based upon their experience as prospectors and miners, both in this country and in the states, the last foot or two of the mass inclosing the vein disclosed therein was country rock, schist, or bed rock, as they expressed themselves, rock in place, and that the vein and vein matter or stringer and vein matter, as some testified, was well defined.

The testimony, however, does not show that the walls were smooth or glazed, but that, on the other hand, they were somewhat shattered, filled with seams and gashes, yet in a solid, natural, or original position, and could be removed only with difficulty, by the use of a pick, although it was admitted that this was partially due to the fact that the surface was frozen at the time. The testimony also, by a fair preponderance, shows that the prospector or miner, having in view the showing made in this open cut and shaft, taking into consideration the vein or vein matter disclosed, and its location and situation in the rock in place, would be justified in the expenditure of his time and money in the further exploration of such vein or vein matter, with the reasonable hope of developing a vein, lode, or ledge of paying ore.

As to the contention that the boundaries of the Rex were not properly marked on the surface of the ground, when the Butler-Petree tunnel location was made, I am convinced that the testimony preponderates that the lines were so blazed that a miner or prospector looking for them could, with reasonable diligence, have found the same upon October 7, 1908, if making the effort with a bona fide intent.

Lloyd's own testimony, to the fact that he visited and examined the open cut on the Rex, before he made his location of

the tunnel, is more or less persuasive that he must have had some idea of the boundaries of the location of the Rex, or could have easily discovered the same by using the ordinary amount of diligence required of a prospector desiring to locate mining ground upon the public domain.

Under the above and foregoing facts, the court is of opinion that the Rex location was valid and subsisting on October 7, 1908, by reason of a discovery of a vein, lode, or ledge, in place, containing gold and gold-bearing rock, and that the boundaries of the location were so marked upon the surface that it could be readily traced. In conclusion it may be said that the principle which must guide this court in determining what constitutes a valid quartz location, so far as the discovery of a vein, lode, or ledge in place, containing gold-bearing rock or other mineralized rock is concerned, must be governed, to no small extent, if not entirely, by what the prospectors and miners of this mining camp consider and know as "rock in place."

Let findings of fact and conclusions of law be prepared in accordance with these views.